George D. KING, Plaintiff,

v.

The UNIVERSITY OF MINNESOTA, and the Board of Regents; Verne Long, Wenda Moore, Wally Hilke, Charles Casey, William Dosland, Erwin Goldfine, Lauris Krenik, David Lebedoff, Charles McGuiggan, David Roe, Mary Shertler, and Willis Drake, all in their capacity as Regents; the University of Minnesota and C. Peter Magrath in his capacity as President of the University of Minnesota; and Fred Lukermann, individually, and in his capacity as Dean of the College of Liberal Arts, Defendants.

Civ. No. 3–83–604.

United States District Court,
D. Minnesota,
Third Division.

June 15, 1984.

Steve G. Heikens, Popham, Haik, Schnobrich, Kaufman & Doty, Ltd., Minneapolis, Minn., for plaintiff.

William P. Donohue and Bonita F. Sindelir, Associated University Attys., Minneapolis, Minn., for defendants.

## MEMORANDUM AND ORDER

DEVITT, Senior District Judge.

The issue in this civil rights case brought by a tenured professor against the University of Minnesota, members of its Board of Regents, and two of its administrators is whether plaintiff's constitutional rights were violated in his removal from the faculty for cause. Plaintiff, a black professor in the University's Department of Afro-American and African Studies since 1970, alleges in an amended complaint filed on May 25, 1983, that defendants violated his due process, equal protection and First Amendment rights in removing him. He brings this action under 42 U.S.C. § 1983 seeking reinstatement to the faculty of the University of Minnesota. Defendants deny wrongful discharge of plaintiff.

The regulations concerning faculty tenure at the University of Minnesota authorize removal for causes which "seriously interfere with the person's capacity competently to perform his duties, or with his usefulness to the University." Tenure Code, § 11. Termination proceedings against a tenured faculty member may be initiated only by the dean of the college that embraces the member's department. Final authority to discharge tenured faculty rests solely with the Board of Regents.

Following a lengthy period which plaintiff's peers and superiors viewed as one of unsatisfactory service and as cause for removal, Fred L. Lukermann, Dean of the College of Liberal Arts, initiated removal proceedings against plaintiff. Plaintiff requested a hearing in accordance with the tenure code. Under the University's established procedures for peer review, a three-person hearing panel of University faculty members was appointed by the Judicial Committee of the University Faculty Senate and accepted by the parties. The faculty panel held hearings for eight days and made Final Findings and Recommendations dated September 15, 1983. On the basis of the hearing record, the faculty panel unanimously recommended that Professor King be removed for cause, stating:

> The facts justify removal for cause because the facts show a serious interference with Professor King's usefulness to the University.

University President C. Peter Magrath, after studying the hearing record and briefs of the parties, concurred. On October 27, 1983, the president recommended to the Board of Regents that the panel findings and recommendation be adopted.

On December 8, 1983, the Board of Regents accepted the panel's findings that Professor King's poor performance seriously interfered with his usefulness to the University within the meaning of Section 11 of the tenure code but placed plaintiff on probation for one year rather than terminate him.

President Magrath, by letter dated December 14, 1983, asked the Board of Regents to rescind its action placing plaintiff on probation and to terminate him as recommended by the faculty panel. The Board met on January 12, 1984, and, in light of the panel findings and considering further comment on the matter, including statements favorable to plaintiff, rescinded its earlier decision and terminated plaintiff for cause. This action followed.

The issues were fully tried to the court for nine days from May 14, 1984 to June 1, 1984. Twenty-four witnesses testified.

It is clear from the evidence adduced at trial that plaintiff's claim that his constitutional rights were violated by his removal is groundless. The findings of the faculty panel adopted by the Board of Regents, are fully supported by substantial evidence in the record and are not arbitrary or capricious. Procedural and substantive due process was accorded plaintiff at every stage of the termination proceedings. He was represented by competent counsel, afforded notice of the charges against him and of the witnesses who were to testify against him. He was given reasonable time and a meaningful opportunity to be heard before

an impartial panel of his peers. The Board of Regents was impartial and based its decisions on the evidence in the record before it. Finally, it is clear that plaintiff was not discriminated against because of his race nor was he terminated in retaliation for exercising First Amendment rights.

The Board of Regents acted permissibly in adopting the findings and recommendation of the faculty panel that plaintiff's unsatisfactory teaching performance seriously interfered with his usefulness to the University and should be removed. Specifically, the panel found that plaintiff was frequently absent from, or tardy for, classes, failed to adhere to announced office hours and his teaching was of poor quality. It found that plaintiff followed inappropriate examination and grading practices, such as permitting a department secretary to conduct examinations. It found that plaintiff's conduct resulted in inordinately low registration in his classes and that this adversely affected the department's budget and goal to encourage majors in the field. The panel received evidence showing that only six out of 22 students in one of plaintiff's classes received a grade in the course and that students complained that a teaching assistant substituted for plaintiff "much of the time." There was evidence that plaintiff was absent from 35% of his classes. It also found that Professor King was often ill-prepared for class, that his lectures were disorganized and often irrelevant to the designated topic and that he frequently failed to make course requirements clear to students.

The findings of the panel reflected that Professor King was engaged in extensive private consulting activities. Concern was expressed on several occasions by colleagues and two successive chairpersons of the department that plaintiff's outside consulting work was taking too much time away from his teaching.

The panel also made extensive findings concerning plaintiff's unwillingness and uncooperativeness in helping the department develop its curriculum and in providing help in departmental governance. His attendance at faculty meetings was sporadic and at times he refused to attend meetings or left prematurely. Faculty members felt strongly enough about Professor King's conduct that they took a formal vote in March 1982 to remove him from the department (nine yes, two no, one abstention). The majority of members of the faculty were black.

Plaintiff's conduct was characterized by the panel as "remarkably casual or even cavalier" in meeting his teaching and departmental responsibilities over a long period of time. His poor teaching practices and absences from, and tardiness in, class attendance occasioned criticism and requests for better performance from his students, associates and superiors. Professor King failed to respond to these requests. Two successive department chairpersons, both black, and the dean of his college requested in writing that he respond to complaints and criticism, and correct his conduct, but such requests were ignored. He offered no explanation of his failure to respond. Plaintiff chose not to testify before the faculty panel to explain or defend his conduct.

The panel properly concluded that the evidence established a pattern of academic irresponsibility and that the overall impact of Professor King's influence in the Department of Afro-American and African Studies was negative, rather than positive or even neutral.

At trial, plaintiff contended the panel's findings were improperly based on a significant amount of hearsay evidence rather than live witness testimony. The rules and practice of the University Senate Judicial Committee allow faculty panels to consider such evidence although its weight may be diminished. In any event, the reliability of the hearsay evidence presented at the hearing was established by its repeated corroboration by other evidence. The panel acted fairly and in accordance with all applicable rules of procedure in its consideration of matters relative to plaintiff.

Plaintiff emphasized at trial that some complaints voiced at the hearing were misunderstood by the panel and other complaints were incorrect or inaccurate. He did not, however, testify before the panel to tell his view of the charges against him. Although plaintiff introduced favorable evidence at trial through the testimony of four former students, he failed to show that complaints concerning his overall teaching performance were in fact unfounded. Substantial evidence produced at trial strongly supports the panel's findings. This came from many witnesses, including one called by plaintiff, Professor Geneva Southall, former chair of the department from 1974–1978. She confirmed the panel's findings regarding plaintiff's absenteeism and other inadequate performance. She conceded that plaintiff's usefulness to the department reached "a point of no return" by 1983 but her view was that the University had an obligation not to terminate tenured faculty but to place them somewhere in the institution where they could function usefully. She was asked, but could offer no suggestion as to where plaintiff might function usefully within the University.

Plaintiff sought to show at trial that Dean Lukermann was unfair in his treatment of, and initiation of removal proceedings against, him. But the evidence did not show that to be the case. Lukermann had reviewed plaintiff's personnel file which showed written complaints from students about Dr. King's absenteeism and teaching practices. It reflected complaints from Department Chairs Geneva Southall and Earl Scott, both black, about Professor King's inadequate teaching and research performance and his absenteeism. Faculty members of the Department, both black and white, urged Lukermann to take action with respect to plaintiff. The faculty had expressed itself by a substantial vote to remove plaintiff from the Department. Department Chairman Scott even threatened to resign unless Dean Lukermann took positive action against plaintiff. Before initiating proceedings of removal, Lukermann had talked with and written plaintiff warning of his inadequate performance. It is clear that Dean Lukermann acted in good faith. He was motivated by plaintiff's long record of poor teaching, absenteeism and lack of response to criticism, and not by personal animosity, racial prejudice or unfairness. The faculty panel expressed the opinion that Dean Lukermann could have been charged with administrative negligence had he not taken action.

Differing statistics were offered by each side pertaining to the percentage of blacks in Minnesota and the percentage on the faculty compared to the student body in an effort to show, or to negative, their statistical significance. The court is satisfied the statistics do not make out a prima facie case for plaintiff, but even if they did, defendants have clearly and convincingly proved that plaintiff was terminated for non-discriminatory reasons.

Plaintiff's claim that he was terminated because of his race is wholly unsupported. He testified before the court that he believed his race was a motivating factor in his discharge because no other consideration could explain his treatment. Professor Southall was the only other witness at trial who testified to a suspicion that plaintiff's race was a factor in his termination. She based her opinion on her experience as a black woman—that "blacks must be twice as good as whites" to maintain their positions. She believed that the University treated the Department of Afro-American and African Studies differently than predominately white departments in the areas of department governance (i.e., adjunct professors were given full voting power in the department) and budget matters.

Even if Professor Southall's suspicion was confirmed at trial, which it was not, the issue here is whether plaintiff was discharged because of his race. The facts show he was removed because of his inadequate performance, and even Professor Southall testified as to that. She said the department sought to elicit from plaintiff only a minimum level of performance and that he repeatedly failed to meet it. She

supported his removal from the department as did other black faculty members.

No evidence was presented at trial to support plaintiff's claim that members of the Board of Regents were improperly influenced by Dean Lukermann or President Magrath. There was no showing that any Regent was lobbied by Dean Lukermann or President Magrath through ex parte communication. President Magrath requested the Board of Regents to rescind its probation decision and to remove plaintiff. As chief administrative officer of the University, he acted within his authority and, according to his letter of December 14, 1983 to the Regents, was prompted by the conviction that the lesser sanction of probation approved by the Regents "will undermine seriously the ability of the University to set and enforce minimum standards of faculty performance."

Similarly, there was no showing that the Regents acted other than properly in voting to terminate plaintiff. Confirmation that the Board acted only on the basis of the record and recommendation of the faculty panel, and not because of race, was offered by Regent Wenda Moore, a former long-time chairperson of the board. She testified that, although she voted to place plaintiff on probation, she believed that fellow regents who voted for removal did so because of their honest conviction that the record before the faculty panel called for that action and not for any improper reason. Regent Moore is black.

Finally, there was no evidence that plaintiff's rights of speech were violated. If plaintiff spoke out against defendants on any subject for any reason, such was not known to defendants and was not a factor in their decision to terminate him.

Plaintiff's constitutional rights were not transgressed. He was given full and fair hearings before the faculty panel, the Board of Regents and the court, and the record clearly shows he was removed, not because of his race, but because he wasn't doing his duty.

These expressions are intended to satisfy the requirements of Federal Rules of Civil Procedure 52(a).

The clerk is directed to enter judgment for defendants.

### ADDENDUM

After trial, plaintiff's counsel objected to the agreed upon procedure followed in this bench tried case for the admission of all listed exhibits of both parties subject to objection. The objection is untimely and not well taken. In deciding the case, the court relied principally on the record made before the faculty panel and the Board of Regents, the testimony of witnesses at trial and exhibits used in connection with that testimony. It was guided by the law stated by the Court of Appeals in *Builders Steel Co. v. Commissioner of Internal Revenue*, 179 F.2d 377, 379 (8th Cir.1950) and *Fields Engineering & Equipment v. Cargill, Inc.*, 651 F.2d 589, 594 (8th Cir. 1981).